THE IDLEHOUR.

NELLIGAN v. THE IDLEHOUR.

(Circuit Court of Appeals, Second Circuit. December 1, 1897.)

No. 6.

MARITIME LIENS—SUPPLIES FURNISHED TO RESTAURANT KEEPER—STATE STAT-UTES.

Under the New York statute giving a lien on domestic vessels for debts contracted by the "master, owner, charterer, builder, or consignee, or the agent of either of them," there is no lien for goods ordered by an independent contractor for the restaurant privileges of an excursion steamer, though, by contract, he furnishes meals to the crew, and though he represents himself to the furnisher as being the vessel's steward, when in fact he neither occupied the position of steward, nor was held out as such by the ship's officers or owners.

This is an appeal from a decree of the district court, Northern district of New York, sustaining a libel filed against the steamer Idlehour under the statutes of the state of New York providing for liens on domestic vessels for supplies, etc.

The vessel was an excursion steamer plying in and near the harbor of the city of Buffalo and Niagara river points. The owner entered into a contract with one Dewitt C. Tower, whereby, in consideration of $600, he rented to said Tower, for the excursion season of 1896, "the restaurant and stand privileges of said steamer Idlehour, said privileges to be exclusive from the bar and stand privileges located upon the promenade deck." Tower also agreed to furnish meals to the crew at a rate of 16½ cents for each meal. On June 3, 1896, Tower came to libelant's store, and stated that he was the steward of the steamer Idlehour, and wanted to buy some groceries for her, if they could be bought cheap enough. The price being satisfactory, he ordered some, which were sent down by libelant's delivery wagon, and delivered on board "down between-decks in the galley." Libelant had never seen Tower before. Thereafter Tower sometimes ordered similar goods personally; sometimes he sent written orders with the heading, "Steamer Idlehour," sometimes with his name signed, and sometimes not. These orders were delivered by a boy "that was working for him." All the goods so ordered were delivered in the same way, viz. by the driver of the delivery wagon; who took them down into the galley. where he turned them over to a woman, whom he supposed was Tower's wife. He says that he saw Tower there quite often, and sometimes while he was delivering goods he saw the captain on the boat walking around, and sometimes up by the pilot house, where he could see the driver and the wagon (which was lettered, "D. J. Nelligan, 39 Main Street; Groceries and Ship Supplies"), but that he never spoke to the captain, nor the captain to him. The captain admits that he saw goods delivered to Tower from this wagon. The last delivery was on August 1, 1896. Libelant understood that the boat was owned by Ziegler. He knew the captain by sight. He never made any inquiries of either to find out whether Tower had any authority to order goods for the boat. He saw Tower on the deck of the Idlehour occasionally when he happened to be on the dock, but never had any talk with him as to his authority, except on the day he first called. It further appeared that Tower had also represented himself to others as the steward of the Idlehour, and obtained supplies from them; his own statements, and the mere circumstance that they subsequently found him on board, being taken by the witnesses as sufficient indication that he was in fact the steward. The evidence for the claimant showed that Tower held no certificate as steward, that he was not uniformed, that he was not represented as steward, nor held out to the passengers as such, nor called steward, nor referred to as such by the passengers, and that during the period in question there was no one on the boat employed as steward, or acting in such capacity, and that the captain and the agent of the excursion line which was running the boat ordered her supplies; that meals were not

furnished at regular hours on the boat, but that it "was run as a restaurant, where anybody that wanted anything could go up and buy it, and pay for it on the spot, the meals having nothing to do with the passenger fares"; that there were signs hanging up where they ate, such as "Dining Hall," or "Dining Room," and also "Sandwiches and Cake," "Tea or Coffee," and that Tower's name was on the bottom of the sign he had up for sandwiches. The libelant further testified that the agent of the excursion line happened in his store some time in July, and made a small purchase, for which he paid cash, and remarked incidentally, "I understand that one of our boats are trading with you, and, if you can make the prices right, we can do considerable business." This is positively denied by the agent, and we do not give much weight to the statement.

J. W. Ingram, for appellant.

Edw. M. Bassett, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM. We are unable, upon these facts, to concur in the conclusion of the district judge. The state statute reserves a lien in the case of debts contracted by the "master, owner, charterer, builder, or consignee, or the agent of either of them," but Tower was certainly not in fact such agent. His contract with the owner shows that the restaurant which he conducted was his own independent enterprise, and the circumstance that he agreed to feed the crew at so much per meal does not alter the situation. Kretzmer v. The William A. Levering, 35 Fed. 783; Durando v. Steamboat Co. (City Ct. N. Y.) 4 N. Y. Supp. 386. Nor is there proof sufficient to sustain the decree upon the theory that the owner of the vessel, having held Tower out to the world as the vessel's steward, is now estopped from denying that he held any such relation. The opinion in the district court thus states the ground of decision:

"It is undisputed that the libelant's goods were delivered there [on board the vessel] openly, in broad daylight, his wagons frequently coming there, with his name upon them; and I think it was the duty of the owners of the vessel, if they did not wish to have the vessel libeled, under such circumstances, to notify the persons furnishing goods to the man who occupied the position of steward, so far as the public were concerned, that they were not responsible; * * * and, not having done so, I am inclined to think that the owners are now estopped from saying that the man who was ostensibly the steward was not in fact the steward."

We do not think that the evidence supports a finding that Tower "occupied the position of steward," nor that he was "ostensibly the steward," and we know of no authority which would require the owners of an excursion steamer to hunt up all persons who may send goods aboard of the kind required by an independent contractor for the restaurant privileges, and notify them that the purchases are not being made for the ship. Reference is made to The Sylvan Stream, 35 Fed. 314, but in that case as appears from the opinion "the goods were sold upon the order of the uniformed and certificated steward of the Sylvan Stream, with the knowledge and consent of the master." And in Bovard v. The Mayflower, 39 Fed. 41, also referred to on the brief, it is stated in the opinion that the provisions for the lunch counter were "furnished under a general order given by the captain." The decree of the district court is reversed, with costs.